SMITH, Justice.
Allstate Life Insurance Company appeals by permission, in accordance with Rule 5, Ala. R.App. P., from the denial of its motion for a summary judgment in an action filed by Randall W. Parker, Jr., against Allstate and its agent, Frank Stin-son.[1] Because we conclude that no justiciable controversy existed at the time Parker filed his complaint, we remand with directions for the trial court to dismiss Parker’s action against Allstate without prejudice.

Facts and Procedural History

On February 26, 1993, Parker went to the office of Frank Stinson, an agent who sold insurance policies for Allstate. At that time, Parker’s brother, Robert Par *683 ker, worked for Stinson, who was Robert’s father-in-law. During his meeting with Stinson, Parker purchased two life-insurance policies — one named Parker as the insured; the other named Parker’s daughter as the insured.
Parker’s complaint alleges that during that meeting Stinson described the policies not as “life insurance” but as a “retirement program” for Parker and an “education fund” for Parker’s daughter. Parker claims that Stinson printed an illustration showing projected future values of the policies. Stinson allegedly discussed the illustration with Parker but did not give a copy of it to Parker. According to Parker, Stin-son claimed that the “retirement program” policy would provide Parker with “a lump sum of money” in the “$80,000 mark” when he reached age 65 and that the “education fund” policy similarly would provide $48,000 to $50,000 in cash when Parker’s daughter reached the age of 18.[2] At the end of the meeting, Parker signed two applications, each of which had been filled out by Robert, who was also present at the meeting. Both applications were entitled “Application for Life Insurance”; neither made reference to a “retirement program” or an “education fund.” In this appeal, Parker concedes that it is undisputed that he knew he was purchasing life-insurance policies.
Parker received copies of the policies in March 1993, and he immediately reviewed them, although he says he did not read them “word for word.” On each of the policies, Parker looked at page 4, which was entitled “Table of Guaranteed Cash Values.” In the “retirement program” policy, Parker noticed that the policy guaranteed a cash value of only $11,540 when he reached age 65 rather than the “$80,000 mark” that Parker claims Stinson had promised.[3]
The next morning, Parker telephoned Stinson and questioned him about the discrepancy between the policy’s stated guaranteed cash value of $11,540 and Stinson’s alleged representation that the policy would have a value in the “$80,000 mark.” Parker claims that Stinson said that the guaranteed value chart in the policy did not reflect what Parker referred to as the “projective [sic] values,” and Parker alleges that Stinson assured him that the policy was “going to be worth $80,000 [when Parker reached] age 65.”
Although Parker also reviewed the policy on the life of his daughter and noticed that the guaranteed cash value for that policy was $2,011 when his daughter reached age 18 — rather than Stinson’s alleged representation that it would be worth $48,000 to $50,000 at that time— Parker could not remember whether he also questioned Stinson about the policy on his daughter. Instead, he testified that he assumed that Stinson intended for the alleged reassurances regarding the projections on the policy on Parker’s life to also reassure Parker regarding the projections on the policy on his daughter’s life.
Parker had no further questions for Stinson, and he continued to pay premiums on the insurance policies.[4] In March 1994, *684 Parker received the first annual report for each policy, and the reports were accompanied by letters from Stinson. The letters and the reports made several references to the policies as policies of “life insurance.” Neither the reports nor the letters, however, referred to a “retirement program” or an “education fund.” Although Parker received similar reports and letters each year thereafter until 2000, Parker testified that he did not read any of them.
On March 6, 2000, Parker filed an action in the Coffee Circuit Court, naming Stin-son and Allstate as defendants. Parker’s complaint alleged that Stinson and Allstate had engaged in fraudulent misrepresentation and fraudulent suppression in connection with Parker’s purchase of the two policies.
Allstate filed a motion for a summary judgment; the trial court denied that motion on December 1, 2004.[5] Allstate then filed a motion requesting the trial court to provide a certification in accordance with Rule 5(a), Ala. R.App. P.[6] The trial court granted Allstate’s motion,[7] and Allstate petitioned this Court for permission to appeal under Rule 5. This Court granted Allstate’s petition.

Discussion

Although this permissive appeal arises from the trial court’s denial of Allstate’s motion for a summary judgment, we conclude, after reviewing the facts and the relevant caselaw, that no justiciable controversy existed at the time that Parker filed his complaint. Therefore, the trial court lacks jurisdiction to consider the merits of Parker’s claims.[8]
*685 In Donoghue v. American National Insurance Co., 838 So.2d 1032 (AIa.2002), this Court considered whether an action brought by an insured against his insurance company presented a justiciable controversy. Donoghue, the insured, alleged that when he purchased the life-insurance policy at issue from American National Life Insurance Company, American National’s agent fraudulently told him that the policy would provide a separate “retirement fund” in addition to a death benefit. Donoghue claimed that American National’s agent represented that the separate “retirement fund” would be worth $125,000 when Donoghue reached age 65; however, Donoghue alleged that he had “later learned that there was no such ‘retirement fund.’ ” 838 So.2d at 1034. American National filed a motion to dismiss Donoghue’s action, in accordance with Rule 12(b)(6), Ala. R. Civ. P., and the trial court granted the motion, concluding “that Donoghue’s claims were not ripe for adjudication.” 838 So.2d at 1034. This Court reversed.
The trial court in Donoghue had relied on decisions of this Court that involved claims of fraud related to “vanishing premium” insurance policies, including DeArman v. Liberty National Life Insurance Co., 786 So.2d 1090 (Ala.2000), Stringfellow v. State Farm Life Insurance Co., 743 So.2d 439 (Ala.1999), and Williamson v. Indianapolis Life Insurance Co., 741 So.2d 1057 (Ala.1999). Donoghue conceded that those cases stand for the proposition that “a claim alleging that a plaintiff might have to pay premiums beyond the date on which the premiums were represented to ‘vanish’ is not ripe for adjudication until a premium payment is made beyond the ‘vanish’ date.” Donoghue, 838 So.2d at 1037 (citing Williamson, 741 So.2d at 1060-61 (“Although there are projections suggesting that the agent’s alleged representation [that premiums would ‘vanish’ in 2002] was false, there is absolutely no way to know whether this representation was true or was false, until the end of the year 2002.”); Stringfellow, 743 So.2d at 440—41 (claims against insurer filed in December 1997 were not ripe for adjudication because they were based on an alleged misrepresentation that no premium payments would be required after July 11, 1998); and DeArman, 786 So.2d at 1092 (“The DeArmans filed this action in January 1996, one year before the represented [‘vanish’] date. Therefore, no cause of action had accrued when the DeArmans filed their complaint and no justiciable controversy existed.”)).
This Court in Donoghue distinguished the “vanishing premium” decisions, concluding instead that Donoghue’s claims were more analogous to the claims presented in Boswell v. Liberty National Life Insurance Co., 643 So.2d 580 (Ala.1994). Donoghue, 838 So.2d at 1037. Donoghue quoted the following passage from Williamson:
*686 ‘“In Boswell, this Court held that insureds could maintain fraudulent-misrepresentation and suppression claims based on their allegations that the insurer had persuaded them to surrender one policy and to purchase, for greater premiums, a policy that was represented to provide greater benefits. The basic question in that case was whether, given that the plaintiffs had made no claim under the policy, they had suffered any injury. This Court held:
“ ‘ “The injury or damage alleged is that the plaintiffs were persuaded, through the fraudulent acts of the defendants, to pay for something they did not receive. In other words, the alleged injury or damage was the payment of greater premiums that were unnecessary because the plaintiffs received no additional coverage in return for the greater premiums and lost benefits they already enjoyed under the old policy.”
“ ‘Boswell, 643 So.2d at 582. Williamson argues that his case is similar to Boswell. We are not persuaded that it is.
“ ‘In Boswell, the plaintiffs were persuaded to purchase something that did not exist and never would exist. In the present case, Williamson purchased policies that will perform as he says he was told they would, if he dies before 2003 or if he does not have to pay premiums on the policies after the year 2002. In other words, because the performance of the policies is directly related to interest rates, Williamson today can only speculate that the policies will not sustain themselves as he claims he was promised.’ ”
Donoghue, 838 So.2d at 1038 (quoting Williamson, 741 So.2d at 1061). This Court, concluding that Donoghue’s complaint presented a justiciable claim, held
“that, under the standard of review for motions to dismiss under Rule 12(b)(6), the dismissal of Donoghue’s claims was erroneous. Viewing the allegations of Donoghue’s complaint most strongly in his favor, we cannot conclude that Dono-ghue could not prove a set of facts similar to those in Boswell — -namely, that due to the alleged tortious actions of the defendants, Donoghue was paying for something that ‘did not exist and never would exist’ and that he consequently has suffered injury sufficient to ripen his claims. Therefore, we reverse the trial court’s dismissal of Donoghue’s claims.”
Donoghue, 838 So.2d at 1038.
Initially, Parker’s complaint appears to allege claims similar to those alleged by Donoghue. For example, paragraph 5 of Parker’s amended complaint states that Parker “was approached by defendant Stinson, acting as agent and/or representative for defendant Allstate, about purchasing an educational fund and a retirement plan with death benefits,” and paragraph 20 alleges that Stinson and Allstate “fraudulently failed to disclose to [Parker] that the policies he purchased did not have a retirement plan or an educational fund” and “that the policies were nothing more than life insurance policies ... [and] every dollar of [Parker’s] deposits was being used for life insurance[,] not as a retirement plan or an educational fund.” Thus, Parker’s allegations suggest that it was fraudulently represented to him that he was purchasing products from Allstate that would offer him a separate retirement program and an education fund in addition to a death benefit; if that were the case, then Parker’s claims arguably would be analogous to the insured’s allegations in Donoghue.
However, Parker’s claims of fraudulent misrepresentation and fraudulent suppression are nothing more than speculation that the policies will not perform as Parker claims he was promised they would. Stat *687 ed somewhat differently, Parker’s claims are based only on speculation that the policy of insurance on his life will not have a cash value of $80,000 when Parker attains age 65 and that the policy on his daughter will not be worth $48,000 when she reaches age 18.
In his deposition, Parker testified as follows regarding his “discovery” of the alleged fraud:
“Q. Tell me this: What are you upset about your Allstate policy for?
“A. I guess the money is not going to be there, from the way I understand it.
[[Image here]]
“Q. Tell me what — you say ‘retirement program.’ What do you understand a retirement program to be?
“A. In other words, the way I understand it, at age 65, when I get ready to retire, I was going to have a lump sum of money that I could retire on. ”
(Emphasis added.)
As mentioned, Parker reviewed the insurance policies upon receiving them in March 1993. Although he says he did not read the polices “word for word,” he did review the “Table of Guaranteed Cash Values” for the policies. When he noticed that the guaranteed cash value of the policy on his life was $11,712 at age 65 rather than the “$80,000 mark” he claims Stinson had promised, Parker almost immediately telephoned Stinson. Parker testified as follows about his telephone conversation with Stinson:
“Q. You say you called Mr. Stinson; what did you say to Mr. Stinson?
“A. I asked him, I said, ‘Frank, I looked over the policies last night, and I noticed in here it’s not showing where I’m getting any retirement of $80,000. And as a matter of fact, it’s showing like $11,000.’
“He said, ‘Well, it’s not showing’— what he told me was, ‘It’s not showing the extra interest and all of that. That’s just the guaranteed stuff, and this is not any of the projective [sic] values. Your policy is going to be worth $80,000 at age 65/ is what he told me.
[[Image here]]
“... I guess he was reassuring me that I was going to be able to get the $80,000 at age 65. ... ”
When asked at his deposition whether he questioned Stinson about the cash value of the policy on the life of his daughter, Parker stated that he did not remember asking about her policy. Instead, he testified:
“A. ... [Stinson] assured — that’s when he told me, you know: ‘This doesn’t have the projective [sic] values in there, and the interest and all of that.’ And I said, ‘Are you sure, Frank?’ And he said, ‘Randall, you’re going to have the money. It’s the best thing on the market now. You will have the $80,000.’
“I’m assuming that he was also at the same time reassuring me that her policy or plan was going to be just as well.
“Q. Mr. Parker, it didn’t strike you as being strange or raising some question in your mind about how under the guaranteed values of my insurance policy of my contract, it only shows $2,000 and that this man is telling me something over the phone that it’s going to have $48,000, how that was going to happen?
[[Image here]]
“A. If they were paying 12 to 14 percent, which interest was probably about that when I bought this policy, I could assume — make a logical decision— and if it didn’t have the projective [sic] values attached to it, which he assured me was going to be like the proposal that he ran off, I could see where it could possibly be that much.
*688 “Q. Think about the words you’ve just used, Mr. Parker, ‘projective [sic] values’ you think could possibly have been that much. That’s what we’re talking about when say ‘projective [sic] values.’
... [WJe’re talking about possibilities and not guarantees, aren’t we?
“A. Yes, sir.
[[Image here]]
“Q. You’ve testified that, without using the term I used, ‘cash value,’ you understood these monies that will be available for your daughter’s education and your retirement was money in the policies]?
“A. Yes, sir.
[[Image here]]
“Q. Well, even though you characterized them as ‘retirement monies’ or ‘education monies,’ you of course understood that whatever monies were available at those times could be used by you for any purpose?
[[Image here]]
“A. Right.
“Q. In other words, while the money could certainly be used for your daughter’s education, it could also be used to buy a car for her if she wanted to use it that way, right?
“A. Yes, sir.
“Q. And while the money may be used by you for retirement purposes, you could have bought a boat or car, taken a trip with it, right?
“A. Yes, sir.”
In his brief to this Court, Parker makes the following statements:
“Randall Parker was cognizant of the fact he bought ‘life insurance;’ however, his perception of Mr. Stinson’s representations was the ‘life insurance’ would have sufficient cash value to provide a retirement fund and education fund at certain times in the future.
“It is undisputed that Mr. Parker understood the insurance sold by Mr. Stin-son was that of life insurance. However, [Allstate] suggests in its brief that Mr. Parker knew the policy Mr. Stinson sold him was a life insurance policy, as if it could not provide a ‘retirement fund’ or ‘education fund.’ ...
“There is no distinction between ‘life insurance’ and ‘retirement fund’ or ‘education fund,’ as [Allstate] suggests in its brief. Retirement funds or education funds are merely benefits of a life insurance policy provided by the accumulation of cash value, not a separate contract, investment, or policy.”
(Parker’s brief, pp. 3-4 (emphasis added).)
Parker’s testimony and his brief to this Court therefore demonstrate that when he purchased the policies he understood that the alleged “retirement program” and “education fund” were not separate from the cash value of the policies — that is, the “retirement program” to which Stinson allegedly referred was the projected cash value of the policy on Parker’s life, and the alleged “education fund” was the projected cash value of the policy on the life of Parker’s daughter.
It is undisputed that the policies have “cash value” and that Parker understood that the alleged “retirement program” and “education fund” consisted of the projected cash values of the two policies, not their guaranteed cash values. Thus, Parker’s claims are not analogous to the claims in Donoghue or Boswell because Parker has not alleged that as a result of the defendants’ tortious conduct he “was paying for something that ‘did not exist and never would exist’ and that he consequently has suffered injury sufficient to ripen his claims.” Donoghue, 838 So.2d at 1038. Rather, Parker claims that he purchased the policies because of an alleged promise that they would be worth certain amounts *689 at certain dates in the future. Because at the time he filed the underlying action it was possible that the policies would be worth what they were allegedly promised to be, Parker had suffered no discernible injury. Consequently, Parker has not presented claims that are ripe for adjudication. Williamson, 741 So.2d at 1061 (“[Bjecause the performance of the policies is directly related to interest rates, Williamson today can only speculate that the policies will not sustain themselves as he claims he was promised. We conclude that Williamson had suffered no discernible injury when he filed his action.... ”). The trial court, therefore, is without jurisdiction to consider Parker’s claims on the merits. Stringfellow, 743 So.2d at 441.

Conclusion

We remand this action for the trial court to dismiss Parker’s claims against Allstate without prejudice.
REMANDED WITH DIRECTIONS.
SEE, HARWOOD, WOODALL, STUART, BOLIN, and PARKER, JJ., concur.
LYONS, J., concurs specially.
NABERS, C.J., concurs in the result.

. Stinson is not a party to this appeal.

. On February 26, 1993, Parker was 30 years old; Parker’s daughter was 4 years old.

. The policies were accompanied by a "10 DAY OFFER TO REFUND YOUR MONEY” that provided: "If you are not satisfied with this policy, you may void it by returning it to us or our agent within 10 days after you receive it. We will give you all of your money back.”

.Both of the policies were paid by "flexible” premiums. The initial annual premium on the policy insuring Parker’s life was $704, and the "planned” annual premium was $720; for the policy insuring the life of Parker’s daughter, the initial annual premium was $200, and the "planned” annual premium was $240.

. In its summary-judgment motion, Allstate argued, among other things, that Parker could not have reasonably relied upon Stin-son’s alleged fraudulent misrepresentations because, Allstate contended, the terms of the policies and the annual reports .Parker had received from Allstate contradicted the alleged misrepresentations. Allstate also argued that Parker’s claims were barred by the statute of limitations applicable to claims of fraudulent misrepresentation and fraudulent suppression.

. Rule 5(a), Ala. R.App. P., provides, in relevant part:
"A petition to appeal from an interlocutory order must contain a certification by the trial judge that, in the judge’s opinion, the interlocutory order involves a controlling question of law as to which there is substantial ground for difference of opinion, that an immediate appeal from the order would materially advance the ultimate termination of the litigation, and that the appeal would avoid protracted and expensive litigation. The trial judge must include in the certification a statement of the controlling question of law.”

. The trial court certified the following statements as the two controlling questions of law in Parker's action against Allstate:
"1. Whether the plaintiff, Randall Parker, could have reasonably relied upon the alleged misrepresentations made by his brother, Robert Parker, and Robert Parker’s father-in-law, Frank Stinson, that Randall Parker was purchasing a ‘retirement plan’ and ‘education plan' that would pay specific amounts in the future where it is undisputed that Randall Parker had been a licensed life insurance agent and had allegedly sold similar policies in the past and that the documents Randall Parker received were contrary to the alleged misrepresentations.
"2. Whether the statute of limitations was tolled for seven (7) years after Randall Parker applied for the policies at issue despite the fact that documents Randall Parker received were contrary to the alleged misrepresentations. ’'

.Because justiciability is jurisdictional, we may consider it ex mero motu. Bedsole v. Goodloe, 912 So.2d 508, 518 (Ala.2005) (“ ' "[J]usticiability is jurisdictional,” Ex parte State ex rel. James, 711 So.2d [952,] 960 n. 2 (Ala.1998); hence, if necessary, "this Courtis duty bound to notice ex mero motu the absence of subject matter jurisdiction.” ' Baldwin County [v. Bay Minette], 854 So.2d [42,] 45 [ (Ala.2003) ] (quoting Stamps [v. Jefferson County Bd. of Educ.], 642 So.2d [941,] 945 n. 2 [ (Ala.1994) ]).”). See also Birmingham-Jefferson Civic Ctr. Auth. v. City of Birmingham 912 So.2d 204, 213 (Ala.2005) (“None of *685 the parties to this case has argued that the issue before us is nonjusticiable; however, questions regarding jurisdiction, that is, questions of the constitutional authority of the courts to exercise power over a matter — going to the very core of the Constitution's structuring the government to constrain its exercise of power — are of such importance that it is the duty of this Court to consider the absence of jurisdiction on our own initiative.”); Stringfellow v. State Farm Life Ins. Co., 743 So.2d 439, 441 (Ala.1999) ("As this Court stated in Luken [v. BancBoston Mortgage Corp., 580 So.2d 578, 580 (Ala.1991)], 'there must be a bona fide existing controversy of a justiciable character or the court is without jurisdiction.' ... Further, in International Longshoremen’s Ass'n v. Davis, 470 So.2d 1215, 1216 (Ala.1985), this Court held: ‘Subject matter jurisdiction [cannot] be conferred by agreement nor can it be waived. Indeed it is incumbent upon the court to notice [a lack of] subject matter jurisdiction sua sponte.’ ”).